## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLOSE ENTERPRISES, INC. d/b/a CLOSE AUTO SALES, on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>ERIE INSURANCE GROUP a/k/a ERIE INSURANCE EXCHANGE,<br><br>        Defendant. | Case No.: 1:20-cv-00147 |

### PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS

### I.   INTRODUCTION

Plaintiff Close Enterprises, Inc. d/b/a Close Auto Sales ("Plaintiff" of "Close Auto") hereby responds to Defendant Erie Insurance Group a/k/a Erie Insurance Exchange's ("Defendant" or "Erie") Motion to Dismiss. For the following reasons, Defendant's motion should be denied.

When the pandemic hit the nation, including Pennsylvania, government officials acted in an effort to control the pandemic and the spread of the virus.  Close Auto was required to abide by these orders and did so.  However, Plaintiff had purchased an ***ALL RISK*** business interruption policy from Erie to help it weather any potential financial storm caused by a forced closure.

Erie asserts that it owes Plaintiff no benefits under its All Risk policy.  Rather than provide benefits to Plaintiff for losses as to which Erie received valuable premiums, the Defendant instead seeks to foreclose such coverage through litigation based on invalid policy interpretations.

As discussed herein, the Motion should be denied outright, or at the minimum, a decision on the motion should be stayed pending an opportunity for Plaintiff to take discovery in this matter

to address the many factual issues that the Motion raises, regardless of Defendant's effort to describe the issues as presenting pure questions of law.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff owns and operates an auto dealership in Pennsylvania. In light of the ongoing COVID-19 pandemic and state and local orders mandating that all non-essential businesses must shut down, Plaintiff's and class members' businesses have suffered property damage, business income loss, extra expenses and other losses. Plaintiff and class members carry insurance policies issued by Defendant ("Policy"). *See* FACAC at ¶¶ 10, 13.[1] The Policy provides, in relevant part, coverage for business income loss and extra expense, including coverage for losses attributable to civil authority orders. *Id*. at ¶ 11.

Business income loss coverage is triggered when Plaintiff's operations are suspended "resulting directly from 'loss' or damage to [the insured property] from a peril insured against." Policy at 24. Extra expense coverage is triggered when Plaintiff incurs expenses "due to partial or total 'interruption of business' resulting directly from 'loss' or damage to [the insured property] from a peril insured against." *Id*. Civil authority coverage is triggered when "a Covered Cause of Loss causes damage to property other than [the insured property]," "action of civil authority [] prohibits access to the [insured property]," "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the [insured property is] within that area but [] not more than one mile from the damaged property," and "[t]he action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property." *Id*. at 25.

---

[1] The facts pleaded by Plaintiff are to be accepted as true in considering a Motion to Dismiss.

The Policy also contains a "virus exclusion" which purports to exclude coverage for any damage "'resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness, or disease." *Id.* at 29.

On March 19, 2020, Governor Wolf issued an Order requiring all non-life- sustaining businesses in the Commonwealth to cease operations and close all physical locations. *See* FACAC ¶ 37.  On April 1, 2020, Governor Wolf issued a Stay at Home Order to the entire Commonwealth of Pennsylvania. *See Id*. ¶ 38.[2]

The status of the closures has not been stagnant because the Coronavirus and the pandemic itself have not been stable and there have been flares and surges of cases, requiring governmental authorities to modify and re-issue orders to address the fluid situation for the safety of the public and to protect property and people alike from suffering injury, damages and losses attributable to the Coronavirus.

The Civil Authority Orders entered by the state and local government were in the exercise of authority to protect the public, minimize the risk of spread of disease, protect property from damage and further damage, and because of contamination and damage to property caused by the coronavirus within one mile of Plaintiff's insured property. Even with the entry of these Orders, there remained physical impact not only in and within Plaintiff's insured property, but in and around the surrounding property due to the omnipresence of the coronavirus.  These Civil Authority Orders were entered due to property damage caused by the coronavirus throughout the state. And the Pennsylvania Supreme Court acknowledged that the Civil Authority Orders were enacted to protect the public from physical damage and loss caused by COVID-19. *See Friends of Danny DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020), *cert. denied*, 2020 WL 5882242 (U.S. Oct. 5,

---

[2] The modifications to the stay-at-home orders enabled Plaintiff to mitigate its damages but did not eliminate the underlying fact of losses and damages that Plaintiff suffered and continues to suffer.

2020) (affirming the Pennsylvania governor's authority to declare the entire state a "disaster area" because "COVID-19 cases have now been reported in all counties in the Commonwealth"). The Civil Authority Orders entered by Pennsylvania state and local governments are similar to such orders entered by other authorities in the United States stating that they were entered because of direct physical damage and loss to property occurring. For example, New York's civil authority order explicitly stated that the coronavirus and *COVID-19 cause direct physical damage and loss to property*.[3] Finding that the coronavirus causes physical damage and loss is the only reasonable understanding of the impact that the coronavirus has had and continues to have in the United States.

Plaintiff, who had no part in the drafting of the Policy language, reasonably expected that they were paying premiums under the Policy for business income loss, extra expense, and civil authority coverage, and that they would not be caught in some semantical trap that enabled Defendant to deny coverage on some ambiguous technicality of the Policy that relies on facts that have not even been established to exist. Insurance contracts are contracts of adhesion and to be interpreted in favor of coverage and against a carrier. Plaintiff has submitted a claim to Defendant related to such losses, only to be denied.

Plaintiff subsequently filed its First Amended Class Action Complaint on September 3, 2020. Defendant filed the present Motion to Dismiss on September 17, 2020.

## III. APPLICABLE LEGAL STANDARDS

### A. Standard for Motion to Dismiss in an Insurance Contract Case

The complaint must contain "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for

---

[3] Emergency Executive Order 101, City of New York, Office of the Mayor (Mar, 17, 2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-101.pdf.

[the] misconduct alleged.'"  *Warren Gen. Hosp. v. Amgen Inc*., 643 F.3d 77, 84 (3d Cir. 2011)

(quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)).

In the context of pleadings related to insurance policies and interpreting insurance policies,

the court must read each policy as a whole and construe its meaning according to its plain

language. *Spector v. Fireman's Fund Ins. Co.,* 451 F. App'x 130, 136 (3d Cir. 2011). "Where a

provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured

and against the insurer, the drafter of the agreement." *Madison Constr. Co. v. Harleysville Mut.

Ins. Co.,* 735 A.2d 100, 106 (Pa. 1999) (citation and internal quotation marks omitted).  A

provision is ambiguous if reasonable people could fairly ascribe differing meanings to it. *Larkin

v. Geico Gen. Ins. Co.*, 2015 WL 667515, at *3 (E.D. Pa. Feb. 13, 2015) (citing *Frog, Switch &

Mfg. Co. v. Travelers Ins. Co.,* 193 F.3d 742, 746 (3d Cir. 1999)). Contractual language is

ambiguous "if it is reasonably susceptible of different constructions and capable of being

understood in more than one sense." *Madison Constr. Co.*, 735 A.2d at 105.  "Ambiguity is not

to be resolved in a vacuum. Contractual terms are ambiguous if they are subject to more than one

reasonable interpretation when applied to a particular set of facts." *Colony Ins. Co. v. Zena

Assocs., LLC*, 2012 WL 12897100, at *2 (E.D. Pa. Dec. 17, 2012) (citing *Madison Const.*, *supra*).

Further, in an adhesion contract – a contract drafted by one party and signed by another

party – it is well established that "in construing any written instrument, and particularly an

insurance contract, the instrument must be strictly construed against the writer." *Kunji Harrisburg,

LLC v. Axis Surplus Ins. Co.*, 2020 WL 1469905, at *3 (E.D. Pa. Mar. 18, 2020) (citing *Miller v.

Boston Ins. Co.*, 218 A.2d 275, 277 (1966).  *See also Mastrobuono v. Shearson Lehman Hutton*,

514 U.S. 52, 62–63 (1995) (ambiguities are construed in favor of the non-drafting party).  "Under

the rule of *contra proferentem,* any ambiguous language in a contract is construed against the

drafter and in favor of the other party if the latter's interpretation is reasonable." *Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 797 (E.D. Pa. 2011) (citing *Sun Co. v. Pa. Tpk. Comm'n,* 708 A.2d 875, 878–79 (Pa.Commw.Ct.1998; Restatement (Second) of Contracts § 206)).

## IV.   ARGUMENT

### A.  Plaintiff's Claims Are Covered by the Policy

#### 1.  The Coronavirus and COVID-19 Cause Direct Physical Loss and/or Property Damage

Defendant's denial of coverage rests primarily on its interpretation of "physical loss" or "damage," arguing that the coronavirus has not and cannot cause physical damage. Such a narrow interpretation of the "physical loss or damage" requirement is contrary to the plain, reasonable, and intended language of the Policy.  *See Hughes v. Potomac Ins. Co. of D.C.*, 1999 Cal. App. 2d 239, 248-49 (Ct. App. 1962).  Further, this assertion presents a question of fact, not a legal issue that can be decided at this early stage.[4]  Nevertheless, other courts and authorities have already affirmed that viruses and diseases like the coronavirus and COVID-19 can cause direct physical loss and property damage in the insurance context.[5]

---

[4] "The proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured." *Bubis v. Prudential Prop. & Cas. Ins. Co.*, 718 A.2d 1270, 1272 (Pa. Super. 1998). "[A] court's focus upon the insured's 'reasonable expectations' is not limited only to situations in which the insurance contract might be deemed ambiguous." *Betz v. Erie Ins. Exch.*, 957 A.2d 1244, 1253 (Pa. Super. 2008). "In any event, where the court finds the policy language to be ambiguous, . . . determination of the parties' intent poses a question of fact." *Id.*

[5] *See* Charles S. LiMandri et al., *Pandemic of Coverage Litigation for Business Income Losses Due to Coronavirus Plagues Insurance Industry*, 32 No. 4 Cal. Ins. L. & Reg. Rep NL 1 (2020) (gathering California cases in which direct physical loss was found without "structural damage or physical alteration to the covered property"); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699 (E.D.Va. 2010) (finding losses due to sulfuric gas released by drywall were covered because "physical damage to the property is not necessary, at least where the building in question has been rendered unusable by physical forces"); *Sullivan v. Std. Fire Ins. Co.*, No. 515, 2007, 2008 WL 361141 (Del. Feb. 11, 2008) (finding mold contamination constituted a physical loss, recognizing "physical" is defined as "having material existence" and mold spores and other bacteria associated with mold undoubtedly have a "material existence" even though they are not tangible or perceptible by the naked eye); *Farmers Ins. Co. of Oregon v. Trutanich*, 858 P.2d 1332, 1336 (Or. 1993) (finding cost of removing odor from methamphetamine lab constituted direct physical loss); *Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968) (en banc) (finding that gasoline fumes which rendered church building unusable constitute physical loss); *Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997) (finding asbestos in building made the use of the building dangerous and constituted physical loss of the building and recognizing "direct physical loss" may exist in the absence of structural damage to the insured property because "a building's function may be seriously impaired or destroyed and

Neither "direct physical loss" nor "damage" or "property damage" is defined in the Policy,[6] but "physical loss of" is clearly an additional, and different, basis for coverage beyond "damage to" property—and a basis which Defendant almost completely ignores. *See Sec. Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1991, 2007 (6th Cir. 1995); *Total Intermodal Servs. Inc. v. Travelers Prop. Cas. Co. of Am.*, No CV 17-04908 AB, 2018 WL 3829767, at *3 (C.D. Cal. July 11, 2018); *see also Narricot*, 2002 WL 31247972, at *4 (recognizing that because the phrase "action of civil authority" was not defined in the policy, and any ambiguity "must be resolved in favor of the insured"). Because these phrases are stated in the disjunctive ("or"), they are clearly separate and distinct triggers of coverage. *See Fountain Powerboat Indus., Inc. v. Reliance Ins. Co.*, 119 F. Supp. 2d 552, 557 (E.D.N.C. 2000).

Numerous courts nationwide agree that physical loss does not require structural damage, but lost operations or inability to use the business is sufficient. *See, e.g.*, *Essex v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009) (finding that unpleasant odor was physical injury to property); *Motorists Mutual Ins. Co. v. Hardinger*, 131 Fed. Appx. 823, 825-27 (3d Cir. 2005) (finding that bacteria contamination of well water would constitute direct physical loss to house if it rendered it unusable); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 2:12-cv-04418, 2014 WL 6675934 (D.N.J. Nov. 25, 2014) (finding the presence of ammonia to constitute physical loss or damage because "property can sustain physical loss or damage without

the property rendered useless by the presence of contaminants"); *Matzner v. Seaco Ins. Co*., 9 Mass. L. Rprt. 41 (Mass. Super. 1998) (finding the phrase "direct physical loss or damage" to be ambiguous and holding carbon monoxide contamination in an apartment building was sufficient to render building uninhabitable and was a "direct, physical loss").

[6] "The proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured." *Bubis v. Prudential Prop. & Cas. Ins. Co.*, 718 A.2d 1270, 1272 (Pa. Super. 1998). "[A] court's focus upon the insured's 'reasonable expectations' is not limited only to situations in which the insurance contract might be deemed ambiguous . . . ." *Betz v. Erie Ins. Exch.*, 2008 PA Super 221, ¶ 10, 957 A.2d 1244, 1253 (2008). "In any event, where the court finds the policy language to be ambiguous . . . determination of the parties' intent poses a question of fact . . . ." *Id.* at ¶ 11.

experiencing structural alteration").[7]   In finding coverage, courts have held that the *loss of functionality* is what is covered.  *Am. Guarantee & Liab. Ins. Co. v. Ingram Micro, Inc.*, No. 99-185 TUC ACM, 2000 WL 726789, at *2 (D. Ariz. April 18, 2000) ("'physical damage' is not restricted to the physical destruction of harm . . . but includes *loss of access, loss of use, and loss of functionality*") (emphasis added).[8]   Further, a condition that renders property unsuitable for its intended use constitutes a direct physical loss, "even where *some utility remains*" constitutes physical loss or damage.  *See Cook v. Allstate Ins. Co.*, No. 48D02-0611-PL-01156 (Indiana Super. 2007); *Stack Metallurgical Servs., Inc. v. Travelers Indem. Co. of Connecticut*, No. 05-1315-JE, 2007 WL 464715 (D. Or. Feb. 7, 2007) (finding insured suffered "direct physical loss of or damage to" covered property when the property could not be used for its "ordinary expected purpose" even though the property could still be used for other income-generating purposes).  It has even been held that fear of damage can be a direct physical loss.  *Murray v. State Farm Fire & Cas. Co.*, 509

---

[7] *See also TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699 (E.D.Va. 2010) (finding losses due to sulfuric gas released by drywall were covered because "physical damage to the property is not necessary, at least where the building in question has been rendered unusable by physical forces"); *Sullivan v. Std. Fire Ins. Co.*, No. 515, 2007, 2008 WL 361141 (Del. Feb. 11, 2008) (finding mold contamination constituted a physical loss, recognizing "physical" is defined as "having material existence" and mold spores and other bacteria associated with mold undoubtedly have a "material existence" even though they are not tangible or perceptible by the naked eye); *Farmers Ins. Co. of Oregon v. Trutanich*, 858 P.2d 1332, 1336 (Or. 1993) (finding cost of removing odor from methamphetamine lab constituted direct physical loss); *Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968) (en banc) (finding that gasoline fumes which rendered church building unusable constitute physical loss); *Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997) (finding asbestos in building made the use of the building dangerous and constituted physical loss of the building and recognizing "direct physical loss" may exist in the absence of structural damage to the insured property because "a building's function may be seriously impaired or destroyed and the property rendered useless by the presence of contaminants"); *Matzner v. Seaco Ins. Co.*, 9 Mass. L. Rprt. 41 (Mass. Super. 1998) (finding the phrase "direct physical loss or damage" to be ambiguous and holding carbon monoxide contamination in an apartment building was sufficient to render building uninhabitable and was a "direct, physical loss").

[8] *See also One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11 C 2520, 2015 WL 2226202, at *9 (N.D. Ill. April 22, 2015) ("Where a general all-risk commercial or homeowner's policy insures against both 'loss' and 'damage' to an existing structure, 'physical' damage may take the form of loss of use of otherwise undamaged property, which in turn suffices as a covered loss."); *Dundee Mut. Ins. Co. v. Marifjeren*, 587 N.W.2d 191, 194 (N.D. 1998) (finding coverage in the absence of physical alteration because the properties "no longer performed the function for which they were designed"); *Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*, 968 A.2d 724 (N.J. App. 2009) (recognizing that since "physical" can mean more than material alteration or damage, "damage" includes loss of function or value, and "physical damage" can include the temporary loss of use due to a power interruption).

S.E.2d 1, 17 (W.Va. 1998) (finding home rendered unusable by increased risk of rockslide suffered direct physical loss even in the absence of structural damage).

A federal court in Oregon took this analysis one step further after an open-air theater shut down because of ambient wildfire smoke and health concerns over poor air quality. *Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 1:15-CV-01932-CL, 2016 WL 3267247 (D. Or. June 7, 2016), *vacated based on a joint stipulated request by the parties,* No. 1:15-CV-019320CL (D. Or. Mar. 6, 2017). The court noted that air was a physical thing and held "[e]ven though the loss or damage was not structural or permanent, the property experienced a loss of 'essential functionality.'" The court went on to find coverage for the loss of business income when the "smoke infiltrated the theater and rendered it "unusable for its intended purpose."

Coverage has also been found where the impairment of function occurred by operation of law. In *General Mills, Inc. v. Gold Medal Insurance Co.*, 622 N.W. 2d 147, 150 (Minn. Ct. App. 2001), a routine inspection discovered that oats had been treated with a pesticide that was used for other food products and presented no danger to consumers, but technically was not FDA-approved for oats. The court found coverage for the undamaged oats, holding "[w]hether or not the oats could be safely consumed, they legally could not be used in General Mills' business. The district court did not err in finding this to be *an impairment of function and value* sufficient to support a finding of physical damage." *Id.* at 152 (emphasis added).

Defendant argues that various other courts concluded that "strikingly similar" policies did not cover "such losses." The non-Pennsylvania law decisions are significantly different here and are clearly distinguishable from this case. In Michigan, the plaintiff conceded it had no property damage. *Gavrilides Mgmt. Co. v. Michigan Ins. Co.*, No. 20-258-CB (Mich. Cir. Ct., Ingham). In New York, the court was addressing a preliminary injunction motion only. *Social Life Magazine*

*Inc. v. Sentinel Ins. Co. Ltd.*, No. 20-cv-3311 (S.D.N.Y.).  In these two cases, the courts cited state laws interpreting *physical damage* as requiring an alteration to the integrity of the property and ignoring the phrase *loss*.[9]  Further, both decisions are not final; thus, this Court should not consider these rulings dispositive at this stage.

In *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323 (S.D.N.Y. 2014), the court denied business income loss coverage because the inability of the business to operate was not caused by physical loss or damage, as required by the policy. In the present case, the Civil Authority Orders are not merely preventative, but resulted from actual physical loss and damage caused by the pandemic.  *Philadelphia Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280 (S.D.N.Y. 2005), the plaintiff there was not covered because the September 11 grounding order was preventative and precautionary, not due to physical damage to the plaintiff's facility, as required by that policy. Further, Plaintiff's Policy here includes Civil Authority Coverage for damage to property other than the Insured Property, so *Philadelphia Parking Auth.* is wholly inapposite.

*Roundabout Theatre Co. v. Cont'l Cas. Co.*, 302 A.D.2d 1 (N.Y. Sup. Ct. 2002), involved a nearby construction accident, but the court denied coverage because the plaintiff's policy only covered damage to the insured property. In *Rose's 1 v. Erie Ins. Exchange*, No. 2020 CA 002424B (D. C. Aug. 6, 2020), a summary judgment case, the plaintiffs did not have civil authority coverage, but argued that a civil authority order by itself constituted direct physical loss, which differs substantially from Plaintiff's argument here.

---

[9] Similar analysis and holdings are found in *Diesel Barbershop, LLC v. State Farm Lloyds*, 2020 WL 4724305, *Malaube, LLC v. Greenwich Inc. Co.*, No. 20-22615 (S.D. Fla. Aug. 26, 2020), and *10E, LLC v. Travelers Indem. Co. of Ct.*, No. 2:20-cv-044118-SVW-AS (C.D. Cal. Sept. 2, 2020).

In *Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.,* 2020 WL 5500221 (S.D. Cal. Sept. 11, 2020), the court dismissed the defective complaint first in its basic form of naming the proper parties, but also the court determined that the plaintiffs did not include allegations explaining how the civil authority orders prohibited plaintiffs from accessing their premises or that the orders were the result of physical loss or damage to adjacent property.  *Id.* at *2.

Finally, Defendant relies on *Cleland Simpson Co. v. Firemen's Ins. Co. of Newark*, 11 Pa. D. & C.2d 607 (Pa. Com. Pl.), *aff'd*, 392 Pa. 67, 140 A.2d 41 (Pa. 1958), a hurricane caused damage to Scranton's water mains. The mayor, in order to prevent fires that could not be extinguished, ordered all stores to be closed. However, as the Eastern District of Pennsylvania articulated in *Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*, No. CIV.A.01-4679, 2002 WL 31247972, at *5 (E.D. Pa. Sept. 30, 2002), *Cleland Simpson*'s policy only insured against fire and civil authority orders resulting from a fire, so a civil authority order preventing a fire clearly falls outside of coverage.

Two recent decisions from the Western District of Missouri both provide support for Plaintiff's argument: *Studio 417, Inc., et al. v.  The Cincinnati Insurance Company*, No. 4:20-cv-03127-SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020) and *K.C. Hopps, Ltd. v. The Cincinnati Insurance Company*, No. 4:20-cv-00437-SRB (W.D. Mo. Aug. 12, 2020).[10]  In *Studio 417*, the plaintiff owned and operated numerous hair salons in the Springfield, Missouri, metropolitan area and sought coverage from its property insurer for business income losses incurred when its hair salons were forced to close as a result of the Coronavirus pandemic and related government closure orders.  The decisions in *Studio 417* and *K.C. Hopps* address two key issues relevant to the Motion

---

[10] The Honorable Stephen R. Bough of the Western District of Missouri presided over both referenced matters. Judge Bough's Order in K.C. Hopps adopted the reasoning detailed in *Studio 417* because both matters involve the same Defendant, similar insurance provisions and similar factual allegations.

to Dismiss before this Court.  Of note, the *Studio 417* court rejected defendant's argument that the civil authority orders at issue did not prohibit access to the premises as required by the policy.[11] Additionally, the court reasoned that because the policy failed to define the key terms of "direct physical loss" and "damage" it was left to "rely on the plain and ordinary meaning of the phrase." *Id*. at 8. Expounding even further, the Court, citing nationwide case law, concluded that absent a physical alteration, a physical loss still occurs when the property is uninhabitable or unusable for its intended purpose and to conclude otherwise would render either "physical loss" or "damage" superfluous. *Id*. at 9.

In a recent decision by the Superior Court of New Jersey, Law Division, in *Optical Services et. al v. Franklin Mutual Insurance Company*, Dkt. No. BER-L-3681-20 (Aug. 13. 2020), the trial court denied a motion to dismiss in a similar business interruption case arising out of the COVID-19 pandemic.  At oral argument, the Court disagreed with defendant's claim that business losses caused by COVID-19 did not constitute "direct physical loss," finding that it was "unsupported … by a blanket review of the policy language." Exhibit 1 at 26.  Moreover, the court also held that the plaintiff "should be permitted to engage in issue oriented discovery" and that a motion to dismiss was "premature at best." *Id*.

In *Blue Springs Dental Care, LLC, et al v. Owners Insurance Company*, 20-cv-00383-SRB, attached hereto as Exhibit 2, the court determined that the plaintiffs adequately stated a claim for a direct physical loss where the insurance policy failed to define the term "physical loss," and the policies do not contain an exclusion clause for "pandemics" or "communicable disease."

---

[11] Defendant also argued that there was no "direct physical loss to property" as required by the policy to trigger civil authority coverage, which the Court rejected for the reasons detailed herein.

Defendant seems to be attempting to make the circumstance one of simply counting the number of decisions in their favor against the number of decisions in favor of Plaintiffs to assert that because the "present" balance favors Defendants, the correct outcome is that all cases should be dismissed.

In its FACAC, Plaintiff alleges that its insured property was at imminent and continued risk of Coronavirus contamination, if it was not contaminated already.   FACAC ¶¶ 44, 57. Defendant's arguments essentially criticize Plaintiff's (and the world's) imperfect knowledge about the presence of COVID-19, but if it were knowable where the virus is, there would not likely be an ongoing pandemic.   Rather, the allegations in the FACAC were based on "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b).

As alleged in the FACAC, the "COVID-19 pandemic has caused Plaintiff and the proposed Class property damage and physical loss."  FACAC ¶ 28.  Plaintiff's business has been affected by the Civil Authority Orders prohibiting access to its insured property due to the clear evidence of the Coronavirus being present throughout Pennsylvania, and the severe safety risks associated with allowing individuals to come in close contact.   FACAC ¶¶ 28, 36-41, 53-56. The Civil Authority Orders upon which Plaintiff relies were issued for the purpose of preventing *the current and future spread* of the Coronavirus.   And as a result of the disaster that had hit the Commonwealth, the court ruled that Orders were executed "to protect the lives and health of millions of Pennsylvania citizens." *Id*. at 889-90.  On March 19, 2020, Governor Wolf issued an Order requiring all non-life- sustaining businesses in Commonwealth to cease operations and close all physical locations. *See* FACAC ¶ 37.  That order stated that "[n]o person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether

the business is open to members of the public." https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf. Further the order stated that "[e]nforcement actions will be taken against non-life sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m." *Id.*

Five months after the *Friends of Danny DeVito* court determined that the infiltration of the Coronavirus throughout the state provided the Governor with "the authority under the Emergency Code to declare the entirety of the Commonwealth a disaster area," *Friends of Danny DeVito*, 227 A.3d at 890, this court was presented with the issue of whether the Civil Authority Orders were constitutional in *Cty. of Butler v. Wolf*, 2020 WL 5510690 (W.D. Pa. Sept. 14, 2020). Judge William S. Stickman determined that the Civil Authority Orders were arbitrarily restrictive. It is true, as Defendant mentions in its brief, the constitutionality of the orders is not at issue here. Moreover, Defendant's reference to Walmart and Home Depot being permitted to stay open is a red herring as those businesses fall within the category of "essential", while Plaintiff's auto sales business did not fall under that category and, therefore, was required to close per the Civil Authority Orders. Moreover, it was clear from the Orders that Plaintiff would have suffered governmental enforcement if it failed to follow the mandates.

Regardless, whether Plaintiff did indeed suffer a physical loss or damage caused by a covered cause of loss is a question of fact, not a legal issue to be determined at the motion to dismiss stage. Because Plaintiff has adequately pleaded allegations supporting coverage, Defendant's motion to dismiss is due to be denied.

## 2. The Complaint Alleges Direct Physical Loss or Damage

Plaintiff alleges that its insured property is at imminent risk of coronavirus contamination, that it has already been contaminated, that surrounding property has been contaminated, and that the properties of Plaintiff's clients have been contaminated. FACAC ¶ 57. As explained above,

the presence of the coronavirus throughout the Commonwealth of Pennsylvania is pervasive, warranting statewide shutdowns and mask mandates. Pennsylvania has had over 172,000 positive cases of COVID-19 and over 8,300 deaths as of the date of this brief, increasing every day.[12]

Because Plaintiff alleges direct physical loss or damage caused by the coronavirus at Plaintiff's insured property, and that both the coronavirus pandemic and the civil authority orders caused Plaintiff's business to shut down, lose income, and incur extra expenses, Plaintiff is entitled to coverage for property damage, loss of business income, and extra expenses.

**B.      The Civil Authority Orders were Issued as a Result of Damage to Property**

Defendant also argues it is absolved from providing coverage under the Policy's Civil Authority provision because the Orders were issued solely to address fears of future damage, and in turn dismissal is warranted because Plaintiff fails to plead facts demonstrating that the Orders were caused by "actual and prior property damage."  Plaintiff's FACAC alleges that COVID-19 caused damage to occur in and around the surrounding location of the Premises and Commonwealth issued the Orders as a direct result of that damage, and Defendant's arguments to the contrary are inadequate to support dismissal at the pleadings stage.

The general elements for triggering civil authority coverage require that the insured suffer a loss of business income: (1) caused by an action of a civil authority that (2) prohibits access to the described premises (3) due to a direct physical loss or damage to property other than at the described premises, and (4) the loss or damage to the property other than at the described premises must be caused by or result from a "covered cause of loss."  *Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*, No. CIV.A.01-4679, 2002 WL 31247972, at *4 (E.D. Pa. Sept. 30, 2002)

---

[12] *See* Pennsylvania, The COVID Tracking Project, https://covidtracking.com/data/state/pennsylvania (last visited August 31, 2020).

All four of these elements are satisfied.  First, the Orders in this case mandating the closure of businesses constitute "action[s] of a civil authority" under the terms of the Policy, and Defendant does not argue to the contrary.  Next, the Orders clearly prohibit access by barring the public from the Premises by law.  *See* FACAC ¶¶ 36-41, Orders, and Section II, *supra*.  Third, Plaintiff's FACAC does in fact allege that the Orders were issued in response to damage to property in and around the area of the Premises.  *Id*.  Finally, the losses caused by COVID-19 and the risk of injury constitute a covered cause of loss under the terms of the Policy.

Plaintiff indisputably alleges that at the time of the entry of the Orders, the spread of COVID-19 was already underway and constituted losses to the area in and around the location of the Premises.  FACAC ¶¶ 44-48.  The link between the damages and the required closure of Plaintiff's business is unmistakable and borne out by the language of the Orders, which verify that the Commonwealth was responding to the *ongoing* and devastating damage caused by COVID-19.  *Id.* at ¶¶ 36-48; 54-57.  One need only review the plain language of the Orders to understand the Commonwealth sought to effectuate a dual purpose: 1) mitigate and ultimately stop the spread of property loss *already caused* by COVID-19 and 2) prevent additional spread that may lead to future loss.  The language of the Orders makes clear that the latter goal of preventing further spread was incidental to accomplishing the former, undermining Defendant's argument.  *See* https://www.governor.pa.gov/newsroom/governor-wolf-and-health-secretary-issue-stay-at-home-orders-to-7counties-to-mitigate-spread-of-covid-19/ (Order closing all non "life sustaining businesses," in order "to mitigate *the spread of COVID-19*.")  (last visited June 2, 2020) (emphasis added).

Every single case Defendant relies on concerns civil authority orders that were entered to address speculative damage that *might* occur in the future.  In this case, Plaintiff has alleged that

the Orders were issued as the result of losses *already* occurring in the area adjacent to the Premises. Defendant's cited cases do not support its argument.[13] Defendant relies on a litany of cases it claims supports the proposition that a policyholder must prove that actual property damage has occurred for coverage to attach.

In *Syufy Enterprises v. Home Ins. Co. of Indiana*, No. 94-0756 FMS, 1995 WL 129229 (N.D. Cal. Mar. 21, 1995), the plaintiff movie theater company was affected by a curfew put in place in response to protests and riots. The relevant provision in *Syufy* required "damage to or destruction of property adjacent to the premises," and the parties stipulated that "no property located within two blocks of any Syufy theater was physically damaged as a direct result of the riots." *Id.* at *1. That fact would clearly preclude coverage, and the court's opinion rested on an analysis of the ambiguous term "adjacent." *See id.* at *1-2. Additionally, the provision in *Syufy* requires that "access to such described premises is *specifically* prohibited by order of civil authority." *Id.* at *1. No such specificity requirement exists in Plaintiff's Policy.[14] In the present case, access to Plaintiff's business was prohibited by the civil authority Orders as a result of physical loss or damage within one mile of the insured property, as the Policy requires. In fact, Plaintiff's claims are more analogous to the scenario that the *Syufy* court exemplified. *See id.* at *3 n.1 ("[T]he following situation would clearly be covered: A building next door to a Syufy theater is damaged by fire; for safety reasons, the civil authorities issue an order closing the Syufy theater

---

[13] Defendant cites summary judgment cases that should not be persuasive at the motion to dismiss stage. *See Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683 (5th Cir. 2011) (relating to a hurricane evacuation order); *Kelaher, Connell & Conner, P.C. v. Auto-Owners Ins. Co.*, 440 F. Supp. 3d 520 (D.S.C. 2020) (same); *but see Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*, No. CIV.A.01-4679, 2002 WL 31247972, at *4 (E.D. Pa. Sept. 30, 2002) (finding civil authority coverage—involving a substantially similar provision to Plaintiff's Policy—following orders to close businesses due to a hurricane); *S. Texas Med. Clinics, P.A. v. CNA Fin. Corp.*, 2008 WL 450012 (S.D. Tex. Feb. 15, 2008); *Assurance Co. of Am. v. BBB Serv. Co.*, 593 S.E.2d 7 (Ga. App. 2003).

[14] Regardless, access to Plaintiff's insured property was specifically prohibited by the civil authority Orders by, *inter alia*, defining "essential" versus "non-essential" businesses.

during repairs to the adjacent building. Any business loss suffered by Syufy for up to two weeks would be covered under the business interruption provision."); *see also S. Hosp., Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1141 (10th Cir. 2004) (comparing cases like *Syufy* "where the civil authority order had only the indirect effect of restricting or hampering access to the business premises" with other cases in which "a civil authority required the insured's premises to close, thereby invoking coverage for business losses").

Further, the Second Circuit in *United Air Lines* held that civil authority coverage could not apply because the prohibition of access to Ronald Reagan National Airport was based solely on fear of *future* attacks. 439 F.3d 128, 134 (2d Cir. 2006). *Dickie Brennan* concerned a claim for business interruption losses arising out of an evacuation order for New Orleans due to the threat of Hurricane Gustav, where the Fifth Circuit held that coverage did not attach because the damage in that case occurred *solely* in the Caribbean. 636 F.3d 683, 685 (5th Cir. 2011).

Here, the Orders were issued to address actual, ongoing damage inflicted in and around the location of the Premises. Furthermore, the Orders mandating the closure of businesses in the Commonwealth clearly reference ongoing loss or damage caused by COVID-19. *See Friends of Danny DeVito*, 227 A.3d at 889-90 (the Orders were executed "to protect the lives and health of millions of Pennsylvania citizens"). Finally, the Orders absolutely prohibited access to the Premises; customers were prevented from entering Plaintiff's dealership. *See infra.* Taking Plaintiff's allegations as true for the purposes of the Motion to Dismiss, Plaintiff has clearly satisfied its burden under the law to state a claim for coverage under the Civil Authority provision of the Policy, and Defendant's Motion must be denied.

### C.   The Court Should Not Enforce Defendant's Virus Exclusion

#### 1.   Plaintiff's Contract Is Inherently Adhesive and Controlling Pennsylvania Law Dictates it Must be Analyzed with Careful Scrutiny

18

An insurance contract, like that obtained by the Plaintiff here, is an inherently adhesive instrument.  The Pennsylvania Supreme Court definitively agrees:

> The traditional contractual approach fails to consider the true nature of the relationship between the insurer and its insureds. Only through the recognition that insurance contracts are not freely negotiated agreements entered into by parties of equal status; only by acknowledging that the conditions of an insurance contract are for the most part dictated by the insurance companies and that the insured cannot "bargain" over anything more than the monetary amount of coverage purchased, does our analysis approach the realities of an insurance transaction.

*Collister v. Nationwide Life Ins. Co.*, 388 A.2d 1346, 1353 (Pa. 1978) (citation omitted).  As a result, courts must employ special considerations when applying Pennsylvania law to analyze an insurance contract.  *See Bishops, Inc. v. Penn Nat. Ins.*, 984 A.2d 982, 989 (Pa. Super. 2009).

Accordingly, a court applying Pennsylvania law must resolve any contractual ambiguities in favor of the insured.  *See Sciolla v. W. Bend Mut. Ins. Co.*, 987 F. Supp. 2d 594, 599 (E.D. Pa. 2013).  ***Most importantly,*** Courts must strictly construe an exclusion against the insurer who is trying to rely upon it.  *Swarner v. Mut. Ben. Grp.*, 72 A.3d 641, 645 (Pa. Super. 2013) ("Exclusionary clauses generally are strictly construed against the insurer and in favor of the insured.").[15]

### 2.    The Virus Exclusion in Plaintiff's policy is Ambiguous and Does Not Apply.

Given that exclusions must be strictly construed against the insurer and any ambiguities resolved in favor of the insured, any ambiguity in the exclusion inures to the benefit of the Plaintiff.

---

[15] *See* Section IV.C. *infra.*

The relevant language of Defendant's Virus Exclusion provides it will not cover for any damage "[b]y or resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness, or disease." *See* Policy at p. 29. However, Government orders and not a virus is what caused Plaintiff's business losses. *See* FACAC ¶ ¶ 36-41, 53, 71-72, 75-76.

"Policy provisions are ambiguous . . . when they are reasonably susceptible of different constructions and capable of being understood in more than one sense." *Swarner*, 72 A.3d at 645 (citation and quotations omitted).  "[This is also not a question] to be resolved in a vacuum. [Rather], contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999). In addition, where a term in the parties' contract is ambiguous, "parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances." *Yocca v. Pittsburgh Steelers Sports, Inc.,* 854 A.2d 425, 437 (Pa. 2004), citing *Estate of Herr*, 161 A.2d 32, 34 (Pa. 1960); *Waldman v. Shoemaker*, 367 Pa. 587, 80 A.2d 776, 778 (1951).

Recently, the Middle District of Florida denied the defendant insurer's motion to dismiss finding that policy is ambiguous.  The court held:

> . . . it is not clear that the plain language of the policy unambiguously and necessarily excludes [p]laintiff's losses. The virus exclusion states that [the insurer] will not pay for loss or damage caused directly or indirectly by the presence, growth, proliferation, spread, or any activity of "fungi, wet rot, dry rot, bacteria or virus." Denying coverage for losses stemming from COVID-19, however, does not logically align with the grouping of the virus exclusion with other pollutants such that the Policy necessarily anticipated and intended to deny coverage for these kinds of business losses.

*Urogynecology Specialist of Florida LLC v. Sentinel Insurance Company, Ltd.*, No. 6:20-cv-01174, at 7 (M.D.Fla. Sept. 24, 2020), attached hereto as Exhibit 3. The Court also notes that none

of the cases the defendant cited to "dealt with the unique circumstances of the effect COVID-19 has had on our society—a distinction this Court considers significant." *Id*

Here, the relevant language from the Virus Exclusion is subject to more than one reasonable interpretation when applied to the particular factual circumstances present. Plaintiff has specifically pled that the Civil Authority Orders caused its losses and not the virus itself. *See See* FACAC ¶ ¶ 53, 71-72, 75-76. What is at issue here is what Plaintiff has pleaded, not how Defendant prefers to interpret the FACAC. Under the factual circumstances, Plaintiff's manner of pleading the claim is completely reasonable and should be accepted for purposes of this Rule 12 Motion. What Defendant is attempting to do, however, is to extend the language of the Virus Exclusion to apply to a claim based on damage caused by orders of a civil authority. Defendant's reading of the exclusion is limitless and would produce absurd results. *See Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992) ("Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results."). Here, Defendant has one goal and one goal only—to avoid coverage.

The Virus Exclusion does not preclude this case because it in no way mentions a pandemic situation or excludes anything related to the damages incurred as result of a pandemic. The World Health Organization has categorized COVID-19 as a pandemic. *See* FACAC ¶ 32. Merriam and Webster's defines pandemic as "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population: a pandemic outbreak of a disease[.]"[16] Other insurers have been much more specific in drafting and specifically using the pandemic language. *See, e.g, Meyer Nat. Foods, LLC v. Liberty Mut. Fire Ins. Co.*, 218 F. Supp.

---

[16] *See* https://www.merriam-webster.com/dictionary/pandemic (last visited July 22, 2020).

3d 1034, 1038 (D. Neb. 2016) ("The actual or suspected presence or threat of any virus, organism or like substance that is capable of inducing disease, illness, physical distress or death, whether infectious or otherwise, including but not limited to any epidemic, pandemic, influenza, plague, SARS, or Avian Flu.").  The Court should not reward the Defendant for failing to properly draft its exclusion nor permit it to expand the scope of its Virus Exclusion that does not address a pandemic.

Accordingly, because Plaintiff's losses were not specifically caused by a virus, because Plaintiff's Policy is an all-risk policy, and because the Virus Exclusion does not address a pandemic, Plaintiff's losses should be covered.  An all-risk policy includes coverage for all risks unless specifically excluded.[17]  Here, there is no such specific exclusion, so the all-risk policy at issue should be found to specifically protect against Plaintiff's COVID-19 losses.

### 3.    Dismissing Plaintiff's Case Based Upon the Virus Exclusion at this Stage Would be Premature

Ultimately, the issue raised in Defendant's Motion to Dismiss regarding the Virus Exclusion is not ripe at this stage of the litigation.  Material and complex factual issues—including the validity, purpose, and scope of the Virus Exclusion—have not yet been fully investigated. There are far too many variables at play that must be ascertained and investigated before the Court can possibly have a clear picture of the nature of this case. The Policy language needs interpretation, and its interpretation rests on the development of a factual record.

For example, discovery is necessary to determine whether Defendant's inclusion of a Virus Exclusion in its Policy resulted in a decrease in premiums (if in fact it was crafted to exclude significant coverage) and how it should be interpreted.  There are questions about how the Virus

---

[17] "All-risks coverage provides coverage for any incident that an insurance policy doesn't specifically exclude." *See* https://www.investopedia.com/terms/a/all-risks-coverage.asp (last visited July 21, 2020).

Exclusion was drafted, what was intended by it, and what information was presented to insurance regulators about the Virus Exclusion.

One issue is whether Defendant drafted the Virus Exclusion itself or relied on language developed and proposed to it by the Insurance Services Organization ("ISO").  *See* Exhibit 4, Declaration of Richard M. Golomb, Esquire, as an example of such discovery to be addressed to the ISO that was served in another case where a Motion to Dismiss was not filed.[18].  This discovery is necessary to determine whether the Virus Exclusion applies in this case and even if so, if Defendant is properly applying it to Plaintiff's Policy and claim as a basis to deny coverage.

### 4. Plaintiff's Regulatory Estoppel Theory Provides an Adequate Basis for Further Investigation

"[U]nder Pennsylvania's doctrine of regulatory estoppel, an industry that makes representations to a regulatory agency to win agency approval will not be heard to assert the opposite position when claims are made by litigants such as insured policyholders." *Hussey Copper, Ltd. v. Arrowood Indem. Co.*, 391 F. App'x 207, 211 (3d Cir. 2010) (citation, quotations, and emphasis omitted); *see also Hussey Copper, Ltd. v. Royal Ins. Co. of Am.*, 567 F. Supp. 2d 774, 786 (W.D. Pa. 2008).  *Hussey* is particularly on point because the Court permitted discovery regarding plaintiff's regulatory estoppel theory, focusing on what was said to state regulators in getting an insurance exclusion approved.  That is exactly what Plaintiff is asking for here.

Plaintiff has specifically alleged that the "ISO develops and publishes policy language that many insurance companies use as the basis for their products." ISO General Questions, Verisk, https://www.verisk.com/insurance/about/faq/ (last visited June 5, 2020); *see also* Insurance Services Office (ISO), Verisk, https://www.verisk.com/insurance/brands/iso/ (last visited June 5,

---

[18] Plaintiff's counsel here are counsel in the case where a Third Party Subpoena was served on the ISO, and are in the midst of negotiating a production of documents by the ISO at this time.

2020)." FACAC ¶ 18.  Plaintiff was not a participant in negotiating or drafting the Policy's content

and provisions and had no leverage or bargaining power to alter or negotiate the terms.  *Id*. at ¶ 19.

The document upon which Plaintiff relies in the FACAC for such allegations highlights that

Insurers should be precluded from using the Virus Exclusion because of misrepresentations they

made to regulators.  *See* https://www.propertycasualty360.com/2020/ 04/07/here-we-go-again-

virus-exclusion-for-covid-19-and-insurers/ (last visited July 22, 2020)[19]

Like in *Hussey,* discovery on what Defendant and/or ISO said to Pennsylvania regulators

in to gain approval of the  Virus Exclusion  should be permitted.

Regulatory estoppel is also firmly rooted in Pennsylvania law based upon the Pennsylvania

Supreme Court's decision in *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189 (Pa. 2001).

In *Sunbeam*, the Pennsylvania Supreme Court reversed the Superior Court's grant of

preliminary objections in the nature of a demurrer instructing the trial court to apply the doctrine

of regulatory estoppel.[20]   The Court based its decision on the following allegations from the

plaintiffs' complaint:

> [I]n 1970 the insurance industry, including the defendant insurers,
> submitted to the Pennsylvania insurance department a memorandum
> which asserted that the disputed language—excluding coverage for
> pollution unless it was "sudden and accidental"—would not result
> in any significant decrease in coverage. The complaint alleged,
> moreover, that the insurance department relied on the industry's
> representation when it approved the disputed language for inclusion
> in standard comprehensive general liability policies without a
> reduction in premiums to balance a reduction in coverage.

---

[19] In a Rule 12(b)(6) motion to dismiss the court may consider "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)) (internal quotation marks omitted).  Accordingly, the article Plaintiff specifically references can be examined because Plaintiff relies upon it in part for its regulatory estoppel allegations.

[20] In Pennsylvania, "[p]reliminary objections in the nature of a demurrer test the legal sufficiency of the complaint." *Haun v. Cmty. Health Sys., Inc.*, 14 A.3d 120, 123 (Pa. Super. 2011) (citation and quotations omitted).

*Id.* at 1192. The Court concluded: "[t]hus, having represented to the insurance department, a regulatory agency, that the new language in the 1970 policies—"sudden and accidental"—did not involve a significant decrease in coverage from the prior language, the insurance industry will not be heard to assert the opposite position when claims are made by the insured policyholders." *Id.* at 1192–93.[21]

The point here is that likely prior to the inclusion of a Virus Exclusion provision in the Policy, the form of Defendant's policies did not exclude claims based on a Virus. If so, and only discovery will enable the parties to know this fact, when the Virus Exclusion was added to a policy, if that addition resulted in a reduction in coverage because of a new exclusion, then policy premiums likely should have been reduced to reflect the reduced coverage, and the state insurance departments should have been made aware that in fact the Virus Exclusion reduced coverage.

But, if there was no disclosure that the Virus Exclusion reduced coverage, and premiums remained the same, the affect was that a policy holder was now paying the same premium for less coverage without the insurance commissioner department knowing of this. The ability of an insurance carrier to rely on an exclusion under these circumstances butts against regulatory estoppel principles.

Accordingly, discovery about the Virus Exclusion is necessary.

D.    **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss and Motion to Strike Class Allegations should be denied.

---

[21] Plaintiff recognizes that a motion to dismiss under the federal rules has a more exacting plausibility standard than the one employed under Pennsylvania law in *Sunbeam*. However, Plaintiff's allegations for regulatory estoppel are more than sufficient to withstand a Rule 12(b)(6) challenge. Plaintiff needs more factual information regarding what was specifically said and understood regarding the Virus Exclusion by Pennsylvania regulators.

Dated: October 9, 2020      Respectfully submitted,

*/s/ Daniel C. Levin*
Arnold Levin, Esq.
Laurence Berman, Esq.
Frederick Longer, Esq.
Daniel Levin, Esq.
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Telephone: (215) 592-1500
alevin@lfsblaw.com
flonger@lfsblaw.com
dlevin@lfsblaw.com

Richard M. Golomb, Esq.
Kenneth J. Grunfeld, Esq.
**GOLOMB & HONIK, P.C.**
1835 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: (215) 985-9177
Facsimile: (215) 985-4169
rgolomb@golombhonik.com
kgrunfeld@golombhonik.com

Aaron Rihn, Esq.
**ROBERT PEIRCE & ASSOCIATES**
707 Grant Street, Suite 125
Pittsburgh, PA 15219
Telephone: (412) 281-7229
Facsimile: (412) 281-4229

W. Daniel "Dee" Miles, III
Rachel N. Boyd
Paul W. Evans
**BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.**
P.O. Box 4160
Montgomery, AL 36103
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

***Counsel for Plaintiff***

## **CERTIFICATE OF SERVICE**

I, Daniel C. Levin, Esquire, certifies that on this date, the foregoing was filed and served via the Court's CM/ECF Filing System.

Date:  <u>October 9, 2020</u>                    <u>*/s/ Daniel C. Levin*</u>
                                                              DANIEL C. LEVIN, ESQUIRE