# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| BLUE SPRINGS DENTAL CARE, LLC, et al., | ) | |
| *individually and on behalf of all others* | ) | |
| *similarly situated,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 20-CV-00383-SRB |
| | ) | |
| OWNERS INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant Owners Insurance Company's ("Owners") Motion to Dismiss (Doc. #4) and Motion to Strike Class Allegations (Doc. #6). The motions have been fully briefed and the Court held oral argument on the motions on September 8, 2020. For the reasons stated below, the motions are DENIED.

## I.  BACKGROUND

This lawsuit is the latest in a nationwide flood of insurance-related litigation by parties seeking coverage for losses incurred during the course of the COVID-19 pandemic. The relevant factual background of this case is briefly set forth below. Since this matter is before the Court on a motion to dismiss, Plaintiffs' factual allegations as set forth in their complaint are taken as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Plaintiffs are Blue Springs Dental Care LLC, Green Hills Dental LLC, Highland Dental Clinic LLC, and Kearney Dental LLC, four dental care clinics located in the greater Kansas City metropolitan area. Owners is an Ohio corporation with its principal place of business located in

Lansing, Michigan.  Plaintiffs each purchased a businessowners insurance policy (the "Policies") from Owners for their clinic, and all parties agree that the policies are materially identical.

The Policies here provide that "[Owners] will pay for direct physical loss of or damage to Covered Property at the premises described in the Declaration caused by or resulting from any Covered Cause of Loss" unless the claimed loss is excluded or otherwise limited.  (Doc. #1-1, pp. 47–48.)[1]  Under the Policies, a "Covered Cause of Loss" is defined as:

> RISKS OF DIRECT PHYSICAL LOSS unless the loss is
>    a.  Excluded in Section B., Exclusions; or
>    b.  Limited in Paragraph A.4, Limitations.

(Doc. #1-1, p. 48.)  The Policies do not define the term "physical loss," and the parties agree the Policies do not contain an exclusion clause for "pandemics" or "communicable disease."[2]  (Doc. #1, ¶ 65.)   A Covered Cause of Loss is required to invoke the coverage provisions of the Policy.  Four coverage provisions are at issue in this case and are set forth in relevant part below.

First, the Policies provide for Business Income coverage in the event of a Covered Loss:

> [Owners] will pay for the actual loss of Business Income you sustained due to the necessary suspension of your "operations"[3] during the "period of restoration."[4] The suspension must be caused by direct physical loss of or damage to property at the described premises . . . caused by or resulting from any Covered Cause of Loss.

(Doc. #1-1, p. 86.)  Second, the Policies provide for Extra Expense coverage, which states that:

---

[1] All page numbers refer to pagination automatically generated by CM/ECF.

[2] Owners relies, in part, on decisions granting dismissal of COVID-19 insurance claims, several of which involve insurance policies that contain a virus exclusion clause.  Owners did not include a virus exclusion clause in the Policies at issue here, making that body of caselaw non-binding on this Court when applying Missouri state law.

[3] The Policies define "operations" as "your business activities occurred at the described premises."  (Doc. #1-1, p. 63.)

[4] The Policies define "period of restoration" as the "period of time that: a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and b. Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality."  (Doc. #1-1, pp. 63–64.)

[W]e will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises . . . caused by or resulting from a Covered Clause or Loss.

Extra Expense means expense incurred:

    (1) To avoid or minimize the suspension of business and to continue "operations":

       (a) At the described premises; or
       (b) At replacement premises or at temporary locations, including:
          (i) Relocation expenses; and
          (ii) Costs to equip and operate the replacement or temporary locations.

    (2) To minimize the suspension of business if you cannot continue "operations."

(Doc. #1-1, p. 86.)  Third, the Policies contain a Civil Authority coverage provision which states:

We extend Business Income and Extra Expense to include the actual loss or damage sustained by you which is a direct result of an interruption of the business covered by this policy because access to the described business premises is prohibited by order of civil authority because of damage or destruction of property adjacent to the described premises by the perils insured against. Coverage applies while access is denied, but no longer than two consecutive weeks.

(Doc. #1-1, p. 91.)  Lastly, the complaint identifies a "Sue and Labor" coverage provision, but no section by that name appears in the Policy.  At oral argument, Plaintiffs clarified that the "Sue and Labor" provision refers to a section within the Policies entitled "Duties in the Event of Loss or Damage," which states in relevant part:

PROPERTY LOSS CONDITIONS

…

3. Duties In The Event Of Loss Or Damage

    You must see that the following are done in the event of loss or damage to Covered Property:

…

    d. Take all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your

3

expenses for emergency and temporary repairs, for consideration in the settlement of the claim. This will not increase the limit of insurance.

(Doc. #1-1, pp. 55–56.)

Most are intimately familiar with the cascading series of events which took place across the nation following the emergence of COVID-19 in the United States, including state and local governments imposing stay-at-home orders in effort to slow the spread of the virus. Missouri is no different.  Plaintiffs were not only subject to Missouri's Stay at Home Order issued on April 3, 2020 ("Missouri SHO"), but also to the stay-at-home orders issued by the county where each dental clinic is located,[5] as well as the stay-at-home order issued on March 24, 2020, by the City of Kansas City, Missouri ("Kansas City SHO").  While the language of each stay-at-home order (collectively, "Stay Home Orders") varies, they all encouraged residents to stay home except when necessary to perform essential activities.  Plaintiffs allege that COVID-19 and the Stay Home Orders have forced them to suspend most of their business operations and deprived them of the use of their dental clinics, thus causing them to suffer "a direct physical loss" and entitling them to coverage under the Policies.

On or around May 6, 2020, Plaintiffs submitted claims to Owners for coverage under the Policies based on losses incurred due to the COVID-19 pandemic.  Owners denied coverage, and Plaintiffs subsequently filed suit on behalf of themselves and similarly situated policyholders that made similar claims under identical Policies and were denied coverage.  Plaintiffs assert eight claims based on the four specified Policy coverage provisions discussed earlier: (1) Count I: Declaratory and Injunctive Relief–Business Income; (2) Count II: Breach of Contract–Business Income; (3) Count III: Declaratory and Injunctive Relief–Civil Authority; (4) Count IV: Breach

---

[5] Highland Dental and Kearney Dental are located in Clay County, Missouri, Blue Springs Dental is located in Jackson County, Missouri, and Green Hills Dental is located in Platte County, Missouri.  (Doc. #1, ¶ 12.) All three counties issued their own stay-at-home orders.

of Contract–Civil Authority; (5) Count V: Declaratory and Injunctive Relief–Extra Expense; (6)

Count VI: Breach of Contract–Extra Expense; (7) Count VII: Declaratory and Injunctive Relief –

Sue and Labor; and (8) Count VIII: Breach of Contract–Sue and Labor.  Jurisdiction is proper

under the Class Action Fairness Act ("CAFA"), given that the proposed class has more than one

hundred members, the amount in controversy exceeds $5 million, and minimal diversity of the

parties is satisfied.  Owners seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6)

and additionally moves to strike class action allegations pursuant to Rule 12(f).

## II.  LEGAL STANDARD

Rule 12(b)(6) provides that a defendant may move to dismiss for "failure to state a claim

upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Ash v. Anderson

Merchs., LLC*, 799 F.3d 957, 960 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).  When

deciding a motion to dismiss, "[t]he factual allegations of a complaint are assumed true and

construed in favor of the plaintiff, even if it strikes a savvy judge that actual proof of those facts

is improbable."  *Data Mfg., Inc. v. United Parcel Serv., Inc.*, 557 F.3d 849, 851 (8th Cir. 2009)

(citations and quotations omitted).

Because this case is based on diversity jurisdiction, "state law controls the construction of

[the] insurance policies[.]"  *J.E. Jones Const. Co. v. Chubb & Sons, Inc.*, 486 F.3d 337, 340 (8th

Cir. 2007).  Under Missouri law, "[t]he interpretation of an insurance policy is a question of law

to be determined by the Court."  *Lafollette v. Liberty Mut. Fire Ins. Co.*, 139 F. Supp. 3d 1017,

1021 (W.D. Mo. 2015) (quoting *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 903 (Mo. App. W.D. 2015)).  "Missouri courts read insurance contracts 'as a whole and determine the intent of the parties, giving effect to that intent by enforcing the contract as written.'"  *Id.* (quoting *Thiemann v. Columbia Pub. Sch. Dist.*, 338 S.W.3d 835, 840 (Mo. App. W.D. 2011)). "Insurance policies are to be given a reasonable construction and interpreted so as to afford coverage rather than to defeat coverage."  *Cincinnati Ins. Co. v. German St. Vincent Orphan Ass'n, Inc.*, 54 S.W.3d 661, 667 (Mo. App. E.D. 2001).

"Policy terms are given the meaning which would be attached by an ordinary person of average understanding if purchasing insurance."  *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 763 (8th Cir. 2020) (applying Missouri law) (quotations omitted).  When interpreting policy terms, "the central issue . . . is determining whether any ambiguity exists, which occurs where there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract." *Id.* (quotations omitted).  If the "insurance policies are unambiguous, they will be enforced as written absent a statute or public policy requiring coverage.  If the language is ambiguous, it will be construed against the insurer."  *Id.* (quotations omitted).

### III. DISCUSSION

After Owners filed its motion to dismiss but before Plaintiffs had filed their response in opposition, this Court denied a motion to dismiss in a similar but unrelated case also involving an insurer's denial of coverage for COVID-19 related losses, *Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-cv-03127, --- F. Supp. 3d. ---, 2020 WL 4692385, at *1 (W.D. Mo.  Aug. 12, 2020). In their response, Plaintiffs contend this case is on all fours with *Studio 417* and urge the Court to reach the same result as *Studio 417*.  In its reply and during oral argument, Owners emphasizes that the facts and circumstances presented in this case are highly distinguishable from *Studio*

6

*417*, namely because Plaintiffs in this case are "essential businesses" that were impacted by the Stay Home Orders in a dramatically different fashion than the "non-essential" business claimants in *Studio 417*.  While *Studio 417* is instructive in certain respects, this case presents a different set of facts and contractual language, discussed in relevant part below.

### A.  Plaintiffs Have Adequately Alleged a "Direct Physical Loss" Under the Policies

As a threshold issue, Owners argues that a direct physical loss or damage is a prerequisite for establishing coverage under the Policy provisions at issue, and contends that Plaintiffs fail to allege facts that plausibly show a physical loss or damage occurred.  Specifically, Owners states Plaintiffs' allegation that their insured properties were damaged because "[i]t is likely customers, employees, and/or other visitors to the insured property over the recent months were infected with the coronavirus" is a naked conclusion that does not satisfy the *Iqbal/Twombly* pleading standard.  (Doc. #5, p. 17.)

Plaintiffs respond that they have sufficiently pled their insured properties were physically damaged, arguing they have adequately alleged that "the presence of COVID-19 on and around the insured property deprived Plaintiffs of the use of their property and also damaged it."  (Doc. #9, p. 7.)  Plaintiffs also contend they sufficiently allege a physical loss, arguing their allegations that Plaintiffs were forced to end or dramatically reduce all operations at their clinics because of "actual contamination by COVID-19" as well as related restrictions imposed by the Stay Home Orders that "prohibited the public from accessing Plaintiffs' covered premises."  (Doc. #9, p. 9.)  Plaintiffs argue that Owners attempts to equate the term "loss" with "damage" when those terms are not synonymous, and note the loss of access to a property or the loss of a property's essential functionality can constitute a physical loss.

7

Upon review of the record, the Court finds that Plaintiffs have adequately stated a claim for a direct physical loss.[6]  As an initial matter, the parties agree that the Policies do not define a direct "physical loss," so the Court must in turn "rely on the plain and ordinary meaning of the phrase."  *Vogt*, 963 F.3d at 763.  The Court elects to adopt the definition of "physical loss" used in *Studio 417* and, upon applying that definition to the factual allegations in the complaint, finds Plaintiffs have adequately alleged a claim for a direct physical loss.  *See Studio 417*, 2020 WL 4692385, at *4 (discussing dictionary definitions of "direct" ("characterized by a close logical, causal, or consequential relationship"), "physical" ("having material existence: perceptive especially through the senses and subject to the laws of nature"), and "loss" ("the act of losing possession" and "deprivation") in determining the plain and ordinary meaning of the phrase "direct physical loss").

Here, Plaintiffs allege that "it is likely customers, employees, and/or other visitors to the insured properties over the recent month were infected with the coronavirus," they "suspended operations due to COVID-19 to prevent physical damages to the premises by the presence or proliferation of the virus and the physical harm it could cause persons present there," and that "customers cannot access the property due to the Stay at Home Orders or fear of being infected with or spreading COVID-19."  (Doc. #1, ¶¶ 17, 70, 18.)  Plaintiffs also explain how COVID-19 is physically transmitted by air and surfaces through droplets, aerosols, and fomites that remain infectious for extended periods of time.  (Doc. #1, ¶¶ 7–9, 44–48, 51, 54.)  Taking Plaintiffs' fact allegations as true, as the Court must at this stage, and after drawing reasonable inferences from those facts in their favor, Plaintiffs plausibly allege that COVID-19 physically attached itself to

---

[6] During oral argument, Owners emphasized that Plaintiffs' allegations did not plausibly show their insured properties suffered any "physical damage."  Given this Court's finding that Plaintiffs adequately allege a physical loss and the disjunctive Policy language contemplates "a direct physical loss *or* damage," the Court need not decide the issue at this stage.

8

their dental clinics, thereby depriving them of the possession and use of those insured properties.

Taken as a whole, Plaintiffs tender more than mere "naked assertions devoid of further factual

enhancement" in their complaint.  *Iqbal*, 556 U.S. at 662.  Additionally, as this Court discussed

in *Studio 417*, this interpretation is supported by caselaw.  *See Studio 417*, 2020 WL 4692385, at

*4–*6 (collecting cases) (summarizing intra-circuit and extra-circuit caselaw recognizing that

"absent a physical alteration, a physical loss may occur when the property is uninhabitable or

unusable for its intended purposes").

### B.  Counts I & II: Business Income Provision

In its briefing and during oral argument, Owners states that no matter what definition of

"physical loss" this Court chooses to adopt, Plaintiffs' claims pursuant to the Policies' Business

Income provision necessarily fail.  Owners argues that to qualify for Business Income coverage,

Plaintiffs' "suspension of operations must be caused by direct physical loss of or damage to" the

insured property.  (Doc. #1-1, p. 86.)  Owners contends (1) Plaintiffs did not suspend their dental

clinic operations because they continued to see patients on an emergency basis, (2) Plaintiffs did

not identify a period of restoration, and (3) Plaintiffs fail to allege any facts showing COVID-19

or the Stay Home Orders actually caused their suspension.  Each argument is addressed below.

### a. Suspension of Operations

Owners asserts "Plaintiffs never suspended their operations" and that their decision "to

temporarily offer only emergency services does not trigger Business Income coverage."  (Doc.

#5, p. 20.)  Owners argues that Missouri courts have interpreted the term "necessary suspension"

to mean "a total cessation of business activity," citing for support *Am. States Ins. Co. v. Creative

Walking, Inc.*, 16 F. Supp. 2d 1062, 1065 (E.D. Mo. 1998).  Plaintiffs note the term "suspension"

is not defined anywhere in the Policies and argue that the plain and ordinary meaning of the term

does not require total cessation.  During oral argument, Plaintiffs identified other portions of the Policies using the word "suspension" in a manner that, in their view, contemplates a partial or complete suspension.  Neither party argues the term is ambiguous.

The Court finds that Plaintiffs have sufficiently alleged a suspension of their operations. The Policies do not define "suspension" and no Missouri state court has interpreted that phrase to have a specific meaning.  While the Eastern District of Missouri found in *Creative Walking* that "necessary suspension" would be ordinarily understood by a lay person to mean a total cessation of business activity, *see* 16. F. Supp. 2d at 1065, that decision is not binding on this Court and is distinguishable given the contractual language in this case.  Even if the Court did elect to adopt the narrow definition from *Creative Walking*, however, Plaintiffs' allegations that three of their dental clinics totally ceased all clinical operations would satisfy their pleading burden.  But this Court should give a phrase in an insurance policy the "meaning which would be attached by an ordinary person of average understanding if purchasing insurance." *Vogt*, 963 F.3d at 763.  As the term at issue is not defined within the Policies, the Court turns to a dictionary to ascertain its ordinary meaning.  *See Doe Run Res. Corp. v. Am. Guarantee & Liab. Ins.*, 531 S.W.3d 508, 512 (Mo. banc 2017) ("When a policy does not define a particular term, courts use the ordinary meaning of the word as set forth in the dictionary.").

The Merriam-Webster Dictionary defines suspension in part as a "temporary removal" or "temporary abrogation of a law or rule."[7]  That definition, in and of itself, does not indicate a suspension must be total or complete in nature.  In addition, the root of the word suspension— suspend—is defined to mean "to debar temporarily from a privilege, office, or function," "to defer to a later time," and "to hold in an undetermined or undecided state awaiting further

---

[7] *See* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/suspension (last accessed Sept. 11, 2020).

information."[8]  Once again, this definition does not suggest that "suspension" refers only to a situation where the act of abrogation, deferral, or removal is done in a full, complete, or total fashion.  In turn, an ordinary purchaser of insurance would not interpret the Policies to exclude coverage for any partial or less-than-total suspension of operations.  *See generally Doe Run*, 531 S.W.3d at 513.

Furthermore, under Missouri law "the provisions of an insurance policy are read in the context of the policy as a whole," not in isolation.  *Am. Econ. Ins. Co. v. Jackson*, 476 F.3d 620, 624 (8th Cir. 2007) (citations omitted) (applying Missouri law).  When other parts of the Policies are examined, the Court finds the Policies contemplate a partial suspension of the insured party's operations.  The Extra Expense subsection of the Business Income provision defines an "Extra Expense" to mean, in part, expenses incurred "to avoid or minimize the suspension of business and to continue 'operations,'" suggesting a suspension of operations includes scenarios where an insured's operations are able to continue at a reduced volume or capacity.  (Doc. #1-1, pp. 50, 127–28.)  Another Policy provision provides that when calculating business income losses, the total loss amount will be reduced "to the extent you can resume your 'operations,' in whole or in part[.]"  (Doc. #1-1, p. 58.)  Again, this language contemplates the insured's ability to be able to operate at some less-than-full or total capacity, also suggesting suspension need not be complete to entitle the insured to coverage.  When interpreting a provision in light of the insurance policy as a whole, "[c]ourts 'must endeavor to give each provision a reasonable meaning and to avoid an interpretation that renders some provisions useless or redundant.'"  *Progressive Cas. Ins. Co. v. Morton*, 140 F. Supp. 3d 856, 860–61 (E.D. Mo. 2015) (quoting *Dibben v. Shelter Ins. Co.*, 261 S.W.3d 553, 556 (Mo. App. W.D. 2008)).  Since other Policy provisions contemplate that an

---

[8] *See* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/suspend (last accessed Sept. 11, 2020).

insured party's business operations can be minimized, continued, or resumed in part, interpreting "suspension" to only provide coverage for a total cessation of operations would contradict other parts of the Policy or render them superfluous.  *See Macheca Transp. v. Philadelphia Indem. Ins. Co.*, 649 F.3d 661, 669 (8th Cir. 2011) (citing *Henges Mfg., LLC v. Amerisure Ins. Co.*, 5 S.W.3d 544, 545 (Mo. App. E.D. 1999) (a court "must give meaning to all [policy] terms and, where possible, harmonize those terms in order to accomplish the intention of the parties.").  Plaintiffs' allegations are sufficient on this point to survive dismissal.

### b. Period of Restoration

Owners argues that Plaintiffs also fail to identify a "period of restoration" because they have not alleged their need to repair, rebuild, or replace any property.  (Doc. #5, p. 21; Doc. #18, p. 11.)  Owners argues the anemic allegations on this issue are indicative of the fatal shortcoming of Plaintiffs' claims, namely that there can be no "period of restoration" because a physical loss or damage never occurred.  Plaintiffs contend they "clearly allege that they began limiting their services to emergency care only starting on or around March 17, 2020," which identifies the start of the period of restoration, and that the loss suffered was ongoing at the time they initiated suit. (Doc. #9, p. 11.)  During oral argument, Plaintiffs emphasized that the alleged physical loss was ongoing at the time this suit was filed and their claim should not be defeated at this early stage, particularly since discovery will illuminate the actual period of restoration in this case.

The Court finds Plaintiffs have met their burden at this stage of the proceeding.  Plaintiffs plausibly allege their dental clinics ceased operations, entirely or in part, "on or about March 17, 2020, and have remained at that limited operational capacity through the date of this Complaint." (Doc. #1, ¶ 16.)  Discovery will ultimately show whether Plaintiffs' alleged closure date was the actual date when the alleged physical loss occurred, the duration of that alleged physical loss, at

12

what point in time the insured properties could or should have been repaired, rebuilt, or replaced, and whether Plaintiffs took those restoration measures.  For now, Plaintiffs have done enough to survive dismissal on this point.

### c. Suspension Caused by a Direct Physical Loss or Damage

Owners insists that Plaintiffs present no factual allegations showing the alleged physical loss was caused by COVID-19 or the Stay Home Orders.  Specifically, Owners argues Plaintiffs' "decision to limit their operations to emergency services and thus not use their properties to their fullest capabilities" was voluntary and not mandated by the Stay Home Orders or by COVID-19. Plaintiffs counter that their insured premises "suffered actual contamination by COVID-19, and related government shut down orders prohibit[ing] the public from accessing" Plaintiffs' clinics. (Doc. #9, p. 9.)  Plaintiffs also argue that the imminent threat of loss or harm posed by the spread of COVID-19 is sufficient to constitute a physical loss, and that their decision to close or reduce operations in light of that threat of harm or loss does not defeat their claim.

The Court finds Plaintiffs have satisfied their burden at this stage of the proceeding and plausibly alleged that COVID-19 caused their alleged physical loss.  As discussed earlier in this Order, Plaintiffs plausibly allege that COVID-19 had physically occupied and contaminated their dental clinics and thereby deprived them of their use of those clinics by making them unusable. Plaintiffs also allege they "suspended operations due to COVID-19 to prevent physical damages to the premises by the presence or proliferation of the virus and the physical harm it could cause persons present there."  (Doc. #1, ¶ 70.)  Plaintiffs' decision to suspend clinic operations due to COVID-19 and the continuing threat to health and safety posed by the virus does not negate their allegation that COVID-19 was the cause of that suspension.  *See, e.g.*, *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 787 F.2d 349, 352 (8th Cir. 1986) (a "commonsense meaning of [the

13

policy provision] is that any loss or damage due to the *danger* of direct physical loss is covered"). Owners argues that to show COVID-19 caused the suspension of operations, Plaintiffs must allege the presence of COVID-19 made their dental clinics unusable or uninhabitable. Owners' argument does not challenge the sufficiency of the pleadings so much as the nature, scale, and scope of the alleged physical loss, including whether the actual danger posed by COVID-19 was concrete, severe, or imminent enough to prevent Plaintiffs from being able to use the dental clinics for their intended purpose. That is an issue better suited for resolution at the summary judgment stage, after the parties have had the benefit of discovery.[9]

In sum, Plaintiffs' claims regarding coverage under the Business Income provision of the Policies survive dismissal and Owners' motion to dismiss Counts I & II is denied.

### C. Counts V & VI: Extra Expense

Owners' arguments regarding the Extra Expense coverage provision are derivative of its arguments regarding coverage under the Business Income provision. Specifically, Owners states Plaintiffs are not entitled to Extra Expense coverage because they did not suffer a direct physical loss or damage, failed to identify a period of restoration, and failed to allege what extra expenses they incurred. Since this Court previously found Plaintiffs' allegations to be sufficient on those issues, and because at this stage Plaintiffs do not have to allege with specificity the itemized extra expenses they have allegedly incurred, Owners' motion to dismiss Counts V & VI is denied.

---

[9] Owners presents persuasive arguments regarding the Stay Home Orders and how the designation as an "essential" business under those orders impacts Plaintiffs' physical loss arguments. However, given this Court's finding that Plaintiffs adequately allege a physical contamination by COVID-19 forced them to suspend their dental clinics' operations, the Court need not decide at this point whether that suspension was caused by the imposition of Stay Home Orders.

14

### D.  Counts III & IV: Civil Authority

Plaintiffs additionally argue that they are entitled to coverage under the Civil Authority provision of the Policies.  In support of dismissal, Owners argues Civil Authority coverage only exists if the relevant order of civil authority is specific to the insured property and the property adjacent to it, rather than an order of general applicability.  Plaintiffs disagree, arguing no Policy language limits coverage to losses arising from a specific, rather than generally applicable, order of civil authority.  Plaintiffs also note that due to the Stay Home Orders and the guidance issued by the Centers for Disease Control ("CDC") and American Dental Association ("ADA"), three of their dental clinics ceased all operations entirely; only one continued to operate, and did so at a significantly reduced capacity.  In its reply brief, Owners argues that Plaintiffs' designation as "essential" businesses exempted them from the Stay Home Orders and contends that Plaintiffs put forth no allegations regarding the damage or destruction of property located adjacent to the dental clinics due to the Stay Home Orders or COVID-19.[10]

First, a review of the Policy language is in order.  The Civil Authority provision provides that Owners extends its Business Income and Extra Expense coverage liability when triggered by a narrowly defined civil authority scenario.  *Cf. Altru Health Sys. v. Am. Protection Ins. Co.*, 238 F.3d 961, 963 (2001).  The coverage-triggering scenario requires there to be (1) an order of civil authority (2) prohibiting access to Plaintiffs' dental clinics (3) because of damage or destruction

---

[10] The Court observes that, in contrast to the analogous Civil Authority provision in *Studio 417* that was labeled as such, the provision here is labeled "Coverage Extension" and appears in a subparagraph within the Electronic Equipment Endorsement's "Additional Coverage" section, specifically the "Business Income and Extra Expense" subsection.  (Doc. #1-1, p. 91, Section 5.b(3).)  During oral argument, the Court inquired whether the Civil Authority provision is broadly applicable or if it is limited to a claim arising under the Electronic Equipment Endorsement. The parties offered differing perspectives on the broad or narrow applicability of the provision. Given that the issue was not raised or briefed by the parties, the Court declines to decide at this point whether Civil Authority provision is broadly or narrowly applicable, the effect of the Electronic Equipment Endorsement on the base insurance policy, or whether a conflict of coverage exists between the two.

15

of property adjacent to those clinics (4) "by the perils insured against[,]" e.g., a Covered Loss under the Policies.  (Doc. #1-1, p. 91.)  The orders of civil authority at issue are the Stay Home Orders.[11]  The Policies do not require that the relevant order of civil authority be specifically directed at the insured premises or properties adjacent to it in order to trigger coverage, and Owners does not cite any legal authority suggesting otherwise.  Further, Plaintiffs allege the Stay Home Orders broadly applied to the areas "in and around Plaintiffs' place of business" and, by their terms, "explicitly acknowledge that COVID-19 causes direct physical damage and loss to property."  (Doc. #1, ¶ 56.)  Given the Court's earlier determination that Plaintiffs sufficiently allege a direct physical loss—the same alleged physical loss which prompted the issuance of the Stay Home Orders—the issue turns on whether access to Plaintiffs' clinics was prohibited by the Stay Home Orders.

Regarding the question of access, Plaintiffs allege the Orders "caused the suspension of non-essential and essential businesses," limited "ingress and egress into the [insured] property," and "required individuals . . . to avoid leaving their homes except as necessary to perform limited activities and to at all times practice social distancing."  (Doc. #1, ¶¶ 17, 18, 35, 39–42.)  The Policies do not define the term "access" and, again, *Studio 417* is instructive on this issue.  In *Studio 417*, this Court found the claimants sufficiently alleged that a stay-at-home order had prohibited access to their business premises "to such a degree as to trigger the civil authority coverage."  2020 WL 4692385, at *7 (citation omitted).  In that instance, the hair-salon plaintiffs

---

[11] The Stay Home Orders are the primary civil authority discussed by the parties, but Plaintiffs also suggest the formal guidance issued by the CDC and the ADA are orders of civil authority that additionally prohibited access to Plaintiffs' dental clinics.  (Doc. #9, p. 15.)  Plaintiffs also allege that some of the Stay Home Orders reference and/or incorporate CDC guidance, including specific CDC guidance that dental clinics "restrict their practices to all but urgent and emergent dental care treatments."  (Doc. #1, ¶¶ 36, 38.)  While the Court's analysis here is limited to Stay Home Orders, in doing so it does not foreclose the possibility that the alleged CDC and/or ADA guidance may form the basis, at least in part, of Plaintiffs' Civil Authority coverage claim.

16

alleged their businesses were closed entirely due to stay-at-home orders, while the restaurant and food-service plaintiffs alleged stay-at-home orders had similarly limited their operations with the narrow exception of delivery or carry-out services.  *See id.*  There, like here, the insurance policy did not specify that "all access" or "any access" to the insured property had to be prohibited.  In this case, Plaintiffs allege three of their dental clinics were closed entirely and, for the clinic that did continue to provide treatment, only emergency dental services were offered.  (Doc. #1, ¶ 16.)  The allegations put forth by Plaintiffs sufficiently establish access to the clinics was prohibited to such a degree that the Civil Authority provision could be invoked.  *See id.*

However, that is not the end of the Court's inquiry. While Plaintiffs allege the Stay Home Orders are what prohibited access to their clinics, Owners argues that assertion is contradicted by the language of the Stay Home Orders.  Owners contends the Stay Home Orders' designation of dental clinics as "essential" businesses excluded Plaintiffs from the restrictions they imposed, citing to various provisions of the Stay Home Orders for support.  (Doc. #18, p. 14; Doc. #5, p. 7.)  While the language cited by Owners is persuasive, the Court declines to consider the cited provisions in a vacuum.  For example, the Jackson County Stay Home Order, cited by Owners in its reply brief, references and incorporates the statewide Missouri SHO, which itself incorporates CDC guidelines and other federal coronavirus guidance—guidance that allegedly directed dental clinics to "restrict their practices to urgent and emergency care treatments."  (Doc. #1, ¶ 16.)  In addition, the Stay Home Orders do not address whether an essential business that performs both "essential" and "non-essential" healthcare services (e.g., elective surgeries in specialty medical clinics, teeth whitening in dental clinics, etc.) could continue to provide non-essential services without restriction.  In sum, there remain unresolved factual questions as to the scope, effect, applicability, and impact of the Stay Home Orders—questions neither side has fully briefed and

17

that are better suited for resolution at a later stage of litigation once discovery has taken place. Plaintiffs' allegations, in aggregate, plausibly state a claim for relief under the Civil Authority provision of the Policies, and dismissal of Counts III & IV is denied.  *See Data Mfg., Inc.*, 557 F.3d at 851 (citation and quotation marks omitted) ("The factual allegations of a complaint are assumed true and construed in favor of the plaintiff, even if it strikes a savvy judge that actual proof of those facts is improbable.").  Whether Plaintiffs are ultimately entitled to the relief they seek will be decided at a later time.

### E.  Counts VII & VII: Sue and Labor Provision

Lastly, Plaintiffs allege they "sustained a loss covered by the Sue and Labor provision" and Owners refused to pay a claim under that provision.  Owners argues Plaintiffs "have not identified any 'expenses borne' by them" or alleged what "actual or imminent loss" necessitated those unidentified expenses.  (Doc. #5, p. 26.)  Plaintiffs contend such specified pleading is not required at the dismissal stage.  During oral argument, Owners additionally asserted that the Sue and Labor provision is, in essence, a duty to mitigate and does not create a basis for standalone coverage.  In response, Plaintiffs argue the Sue and Labor provision entitles them to coverage of certain losses they allegedly suffered and that Owners' failure to pay for those losses entitles them to sue for coverage.

An insurance policy is, at its core, a bilateral contract which establishes the obligations and duties of the insurer and the insured.  *See Omaha Indem. Co. v. Pall, Inc.*, 817 S.W.2d 491, 496 (Mo. App. E.D. 1991) ("An insurance policy is a contract designed to furnish protection according to the needs and desires of the insured.").  Plaintiffs allege they have "substantially performed their obligations under the terms of the Policies," including "complying with the [Stay Home] Orders[.]"  (Doc. #1, ¶¶ 135–136, 71.)  At oral argument, Plaintiffs expanded somewhat

on that allegation, stating their continued compliance with the Stay Home Orders was necessary in light of the dangers posed by COVID-19 and caused them to incur expenses and damages.

In *Studio 417*, this Court examined a nearly identical Sue and Labor contract provision and determined the plaintiffs, by alleging the suspension of their operations and complying with relevant closure orders, had adequately stated a claim for a covered loss. *See* 2020 WL 4692385, at *8. The result is the same here and the claims thus survive dismissal. However, during oral argument Plaintiffs acknowledged that some of the losses allegedly arising under this particular Sue and Labor provision may be duplicative of their alleged Business Income and Extra Expense losses, at least to some extent. The Court reserves for a later time the issue of whether the Sue and Labor claims asserted here are derivative, and therefore duplicative, of other coverage claims asserted elsewhere in the complaint.

In sum, Owners' motion to dismiss is denied in its entirety. However, as this Court stated in *Studio 417*, all the rulings herein are subject to further review following discovery. Further, as relevant caselaw in the COVID-19 context continues to develop, subsequent decisions construing similar insurance provisions under similar facts may be persuasive. If warranted, Owners may reassert its arguments at the summary judgment stage.

**F.  Rule 12(f) Motion to Strike Class Allegations**

Owners additionally filed a motion to strike class allegations contemporaneously with its motion to dismiss. Pursuant to Rule 12(f), a court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Striking a party's pleading, however, is an extreme and disfavored measure." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (citation omitted). Particularly in the context of a class action suit, striking class allegations prior to discovery and the class certification stage is a rare

remedy "because it is seldom, if ever, possible to resolve class representation question from the pleadings alone." *Courtright v. O'Reilly Auto., Stores, Inc.*, No. 14-00334-CV-W-GAF, 2014 WL 12623695, at *2 (W.D. Mo. July 7, 2014) (citations and quotation marks omitted).  Given the early stage of litigation in this case and "the chance exists that Rule 23 elements may be satisfied with discovery," *id.*, the Court declines to strike the class action allegations specified by Owners.  Consequently, the motion to strike is denied.

## IV. CONCLUSION

Accordingly, it is hereby **ORDERED** that Defendant Owners Insurance Company's Motion to Dismiss (Doc. #4) is DENIED and Motion to Strike Class Allegations (Doc. #6) is DENIED.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH, JUDGE
UNITED STATES DISTRICT COURT

DATE: September 21, 2020

20